**Gilbert HENRY, Petitioner-Appellant,**

v.

**Hayden J. DEES, Warden, et al., Respondents-Appellees.**

No. 79–2585.

United States Court of Appeals, Fifth Circuit.*

Unit A

Oct. 8, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

George M. Strickler, Jr. (Court-appointed), Michael G. Collins, Ann Woolhandler, New Orleans, La., for petitioner-appellant.

Harry F. Connick, Dist. Atty., David J. Cortes, J. Kevin McNary, Asst. Dist. Attys., New Orleans, La., for respondents-appellees.

Before WISDOM, POLITZ and SAM D. JOHNSON, Circuit Judges.

POLITZ, Circuit Judge:

Gilbert Henry, a twenty year old marginally mental retardate,[1] was charged in Louisiana state court with armed robbery.[2] On the day of trial Henry and his attorney reached an agreement with the prosecutor. Their compact provided that Henry would

---

1. The record reflects that Henry is an educable mental retardate; his intelligence quotient is placed between 65 and 69. Although Henry academically completed the sixth grade, his reading skills are on the second grade level.

2. Henry was convicted under La.R.S. 14:64. The prosecution's theory of the case depicted Henry as a principal in the armed robbery of a clothes cleaning establishment; he drove the "getaway" car. *See* La.R.S. 14:24. On February 19, 1975, Henry was arrested while driving an automobile in which Albert Farrar, who had actually robbed the cleaners, was a passenger. Farrar pled guilty and was sentenced to prison for five years.

submit to a polygraph examination. Should it be concluded that he was truthful in denying criminal involvement, the district attorney would submit the case *nolle prosequi*; however, if Henry "failed" the examination he would plead guilty. During the administration of the polygraph test, before its completion and outside the presence of counsel, the examiner, Police Sergeant Ruiz, informed Henry that he had "failed." Henry then made inculpatory statements which were introduced at trial, over objection. Henry was convicted and sentenced to twenty years imprisonment.[3] His petition for relief under 28 U.S.C. § 2254 was denied by the district court. We reverse and remand.

## I. BACKGROUND

The facts are uncontroverted and straightforward, a clarity most helpful in resolving the legal issues presented. On May 21, 1975, the day Henry was scheduled to stand trial, his counsel and the prosecutor concluded an agreement regarding a polygraph examination Henry's counsel had requested. An Agreement and Stipulation and a Certificate of Understanding[4] were drafted and discussed by the district attorney, Henry, and Henry's counsel for approximately ninety minutes before signing. Thereafter, a state district judge questioned Henry concerning his waiver of certain constitutional safeguards. Paragraphs 5 and 7 of the Certificate of Understanding contain the provisions currently significant. Paragraph 5 reads: "I realize that when taking *this polygraph examination* I waive my rights to presence of counsel and the right to remain silent, and any statements made by me *during the polygraph examination* may be used against me in any court or other legal proceeding." (Emphasis added.) Paragraph 7 provides, "[i]f during any phase *of the examination*, the defendant confesses his guilt, or makes an admission . . . all such statements (oral and/or written) shall be admissible without objection by the defense at any trial or hearing." (Emphasis added.) With the Agreement and Stipulation and Certificate of Understanding signed, the stage was set for the examination. Sergeant Ruiz and Henry entered the testing room alone.

According to Sergeant Ruiz, under the standard operating procedure the examiner asks the examinee a prepared battery of questions, stops, and then repeats the questions. Sergeant Ruiz testified that this enables the examiner to isolate and correct problems, such as difficulty in comprehension, the examinee may have encountered. Upon completion, the results are analyzed. Sergeant Ruiz did not follow this procedure in his examination of Henry. Instead, immediately after asking the first twelve questions, Sergeant Ruiz stopped the testing and informed Henry that he had "failed." Ruiz testified: "I then said, 'Well, what is it Gilbert? Why can't you tell the truth about this thing? Are you afraid that you're going to jail?' . . . I said, 'Well, do you want to tell me about the

---

**3.** The Supreme Court of Louisiana affirmed the conviction. *State v. Henry*, 352 So.2d 643 (La. 1977). Justice Dixon, now Chief Justice, dissented, "being of the opinion this mental retardate could not knowingly and intelligently confess . . . ." 352 So.2d at 649 (Dixon, J., dissenting).

**4.** Paragraph 2 of the Agreement and Stipulation states:

The specific polygraph procedures to be used, both the scope and actual wording of the relevant test questions, the examination questions, and all other aspects of the examination shall be at the polygraphist's sole discretion.

Paragraph 9 of the Agreement and Stipulation further provides that:

The polygraphist is acknowledged by both sides to be an expert in all phases of both administering polygraph examinations and in the analysis of polygraph chart recordings. The side offering him as a witness will be allowed to fully develop his expertise and offer into evidence his opinions as to the defendant's truthfulness or lying to the relevant test questions as they appear in the polygraphist's written report at any trial or hearing involving this indictment. The opposing side hereby expressly waives, any and all objections of such testimony as to the competency, weight, relevancy, remoteness, or admissibility of such testimony based upon public, legal, judicial, social policy, due process of law, and/or such rules of evidence as might otherwise govern.

thing or you don't [sic]?'" Henry then made inculpatory statements.

The appellant posits two discrete but interrelated contentions. First, he argues Sergeant Ruiz exceeded the parameters of a proper polygraph examination by asking questions directly calculated to elicit inculpatory remarks, not designed to develop reliable test results. In the process, Henry claims that his fifth amendment right against self-incrimination was infringed; the Agreement and Stipulation and Certificate of Understanding pertained only to legitimate polygraph examination. Second, the appellant urges that, in view of (1) his limited mental ability, (2) the absence of counsel when he uttered incriminating remarks, and (3) the lack of warnings immediately prior to Sergeant Ruiz's interstitched questioning, he did not knowingly and intelligently waive his constitutional rights. Considering the combined force of the totality of these contentions, in light of all of the pertinent circumstances, we conclude that Henry's statements were not freely and voluntarily made. They should have been suppressed.

## II. WAIVER AND ITS SCOPE

The waiver of constitutional guarantees is a matter of federal constitutional law. The Supreme Court announced in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), a standard that has been repeated and affirmed; the burden is upon the state to demonstrate "an intentional relinquishment or abandonment of a known right or privilege." *Id.* at 464, 58 S.Ct. at 1023. The Supreme Court has consistently required adherence to a "totality of the circumstances" test in assessing the effect of constitutional waivers. *See North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Boulden v. Holman*, 394

U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

■■■■ As we recently noted, "[i]n considering the voluntariness of a confession, this court must take into account a defendant's mental limitations, to determine whether through susceptibility to surrounding pressures or inability to comprehend the circumstances, the confession was not a product of his own free will." *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980) (en banc), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). A fundamental concern is a mentally deficient accused's vulnerability to suggestion. *See Sims v. Georgia*, 389 U.S. 404, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).[5]

■■■ Even assuming that Henry could meaningfully grasp his constitutional rights so as to admit of a valid waiver,[6] we are not convinced he knew or could understand the range and scope of proper polygraph examination questioning. Although the Agreement and Stipulation recites that the wording of the test questions "shall be at the polygraphist's sole discretion," the inquiries propounded must still be "relevant test questions." *See* note 4, *supra*. When Sergeant Ruiz prematurely told Henry that he had "failed," an inference that the "machine" had detected him, Ruiz breached the allowable bounds of test questioning. The Sergeant moved from administration of a polygraph examination to police interrogation without pausing to remind Henry of his privilege against self-incrimination and his right to have his counsel present during questioning.

During the examination Henry was alone with Sergeant Ruiz; he was not allowed to communicate with counsel. This isolation

---

5. The Supreme Court has recognized educational and mental shortcomings as relevant factors in the voluntariness analysis. *See, e. g., Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966);

*Ward v. Texas*, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942). *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), teaches that weakness of will or mind are important considerations in this determination.

6. *But see Cooper v. Griffin*, 455 F.2d 1142 (5th Cir. 1972).

was designed to permit completion of the test without interruption or extraneous influence; it is part of the effort to secure accurate polygraph results. The examination, however, was not conducted as planned, and it was not routinely concluded. Instead, the examination quickly devolved into an exercise which the fifth amendment restrains. We find pertinent the following which, cumulatively, compel our decision.

### Misrepresentation

Sergeant Ruiz's statement to Henry that he had failed the examination lacked verity. The examination was aborted; purportedly definitive results were never secured. We cannot glean from this record the veracity of Henry's responses to the questions that were asked. *Oregon v. Mathison*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), suggests that false police statements do not necessarily render an interrogation environment coercive, but the Supreme Court considered the factor relevant.[7] Henry was in no position to dispute the polygraph examiner or the ominous "lie detector" machine. Considering his age and his limited mental acumen, this turn of events had to weigh heavily upon him. This must be considered in the overall evaluation of what later transpired.

### Interrogation

■ A crucial issue in this appeal is whether Sergeant Ruiz's dialogue with Henry constituted "interrogation." The Supreme Court has defined interrogation as queries "reasonably likely to elicit an incriminating response from the subject." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted). Ruiz's statement that Hen-

ry had failed the test, and his challenge to Henry to "tell the truth about this thing" constitutes such interrogation. Accordingly, the commands of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), apply. The issues now raised are whether Henry was adequately warned and whether he consented to the interrogation.

It is nigh onto superfluous to remind that *Miranda* forbids interrogation unless prefaced by a list of cautions.[8] In addition, "*Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to 'posit[ ]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.'" *Rhode Island v. Innis*, 446 U.S. at 299, 100 S.Ct. at 1689.

■ At the suppression hearing, Henry's counsel testified that, when he advised Henry to sign the various instruments and submit to the polygraph examination, there was no suggestion the examination would range beyond the typical scope and become an interrogation session. Neither Henry nor his counsel contemplated that the instruments they signed exposed Henry to questioning which was not an integral part of a polygraph examination. Nonetheless, Henry was subjected to interrogation by a police officer, out of the presence of his counsel, and without the benefit of meaningfully timed *Miranda* warnings. We conclude that Henry did not consent to this mode of questioning, nor did he waive his rights in that regard prior to entering the examination room. The final inquiry is whether he waived his rights after entering the room.

---

7. Whereas the misleading police statement "has nothing to do with . . . *custody* for purposes of the *Miranda* rule," 429 U.S. at 496, 97 S.Ct. at 714, the Court noted, "[t]he officer's false statement about having discovered Mathison's fingerprints at the scene was found by the Supreme Court of Oregon to be another circumstance contributing to the coercive environment which makes the *Miranda* rationale applicable." *Id.* at 495, 97 S.Ct. at 714. The Court then wrote that this fact may have "rele-

vance . . . to other issues in the case" *id.* at 496, 97 S.Ct. at 714, than custody.

8. The accused must be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires . . . ." *Miranda v. Arizona*, 384 U.S. at 479, 86 S.Ct. at 1630.

*Henry's Subnormal Intelligence*

As noted, Henry's intelligence quotient places him in the educable mental retardate category. His mental capacity brings into serious question his understanding of the documents he signed. The record contains uncontradicted testimony of a psychologist that it was unlikely Henry could have understood the complex waivers and their consequences. Given this evidence, we are persuaded Henry did not separately and independently waive his constitutional rights when he was alone with Sergeant Ruiz in the examination room.

When persons of markedly limited mental ability, such as Henry, are questioned without the aid of counsel, issues "of suggestibility and possible overreaching are raised ... and must be factored into a consideration of the totality of the circumstances." *Jurek v. Estelle*, 623 F.2d at 938. Extra precautions must be taken. It must be painstakingly determined that they comprehend what events are transpiring. In addition, the presence of counsel should be assured absent an unmistakable, knowing waiver of that assistance.

## III. CONCLUSION

To find Henry's incriminating statements voluntary "we must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Jurek v. Estelle*, 623 F.2d at 937. We cannot so conclude. Our appraisal of the totality of the circumstances persuades us that Henry's statements were not freely and voluntarily made. We are convinced that Henry did not knowingly and intelligently waive his fifth amendment privilege as to questions outside the reasonable ambit of a polygraph examination. Habeas corpus relief should have been granted. The decision of the district court is REVERSED. The matter is REMANDED for entry of an appropriate order directing the timely retrial of Henry, in which

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

the inculpatory comments discussed herein will not be used, or his release from confinement.

REVERSED and REMANDED.