499 A.2d 337

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Allan BENJAMIN.**

Superior Court of Pennsylvania.

Argued May 22, 1985.

Filed Sept. 18, 1985.

118

Michael J. Barrassee, Assistant District Attorney, Scranton, for Commonwealth, appellant.

William R. Lee, Scranton, for appellee.

Before CAVANAUGH, CIRILLO and HESTER, JJ.

HESTER, Judge:

This Commonwealth appeal is from a pre-trial order granting appellee's motion to suppress. The pre-trial order suppressed all statements made by appellee on November 21, 1983, while he was at the Pennsylvania State Police Headquarters in Dunmore, Lackawanna County, Pennsylvania.

■ Prior to reviewing the suppression order, we must determine whether it is appealable. In *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985), our Supreme Court held that the Commonwealth's appeal from a suppression order was proper as long as the Commonwealth certified in good faith that the order either "terminates" or "substantially handicaps" the prosecution. The good faith certification is a precaution to meritless appeals designed solely for delay. It is no longer necessary for this Court to make an independent determination from the record whether the suppression order "terminates" or "substantially handicaps" the prosecution. *See Commonwealth v. Lapia*, 311 Pa.Super. 264, 457 A.2d 877 (1983), for the former rule which required an independent review of the record to determine the appealability of suppression orders.

The Commonwealth has certified that the suppression of appellee's statements terminates or substantially handicaps the prosecution. Accordingly, the suppression order is appealable.

In order to review the propriety of the suppression, we must consider the pertinent facts. On November 21, 1983,

the Scranton Police Department arranged with Corporal Pasquale Raico of the Pennsylvania State Police to administer a polygraph examination to appellee concerning the May, 1977 murder of a man in Nay Aug Park, Scranton. Appellee consented to the polygraph, and he was accompanied by counsel, Richard Borthwick, to the examination.

With Borthwick present, Raico commenced the preliminary stage of the polygraph examination at 11:00 A.M. During this stage, Raico instructed appellee that the actual examination was a two-hour process and that if it interfered with his plans, appellee was welcome to use the telephone to make rearrangements. Appellee declined the offer.

Raico proceeded to describe how the polygraph machine functioned, what parts would be connected to appellee, whether he would have sensation and what impulses were transmitted to the charts. Raico also reviewed every question with appellee prior to the actual examination, giving appellee an opportunity to formulate his answers and to participate in revising any objectionable questions.

Having explained the test procedure, and with counsel still present, Raico read *Miranda* warnings to appellee and obtained a written waiver of his *Miranda* rights. The waiver form consisted of *Miranda* rights, a waiver of those rights and an acknowledgement that the waiver was voluntary, that the examination had been explained and that appellee understood the explanation of the proposed examination. Appellee's first signature then appeared. Below this signature, the form included a statement that the subject voluntarily submitted to the examination knowing that he could leave at any time. Appellee signed the form a second time below that statement. The waiver form was reviewed and signed in counsel's presence. Immediately thereafter, Raico presented background questions concerning appellee's age, height, weight, color of hair and eyes, health, education and whether he recently consumed drugs, alcohol or medication.

At that point, counsel was instructed to leave as Raico embarked on questions concerning the Nay Aug Park inci-

dent. Raico testified that a good rapport between examiner and subject is most likely to occur when they are alone in the examination room. Raico considered this so important that the test would not have been administered had counsel refused to leave.

The actual polygraph examination concerned only the Nay Aug Park murder. Upon completion of the examination, Raico "ran the charts." That procedure consumed twenty minutes and involved the processing of impulses created by appellee's answers.

The charts were completed at 1:40 P.M. For the next forty minutes, Raico explained why the charts indicated that appellee was giving deceptive responses, and appellee was given an opportunity to explain the result which was alleged to be a deception. It was during this forty-minute period that appellee made the inculpatory statements.

Upon learning the results, appellee denied culpability. Thereafter, for three or four minutes, Raico reviewed the charts. Appellee then stated that he did not remember being in Nay Aug Park on May 11, 1977. Raico then reviewed the test results with appellee a final time over a fifteen-minute interval. Appellee requested immunity because he feared going to jail again. At that point, the private meeting between Raico and appellee terminated, and Attorney Borthwick was called to the room.

The lower court held that Corporal Raico conducted an interview following the actual polygraph examination. According to the lower court, the interview was not related to the test; it constituted an interrogation for which *Miranda* warnings should have been repeated. Finding the *Miranda* warnings issued at the pre-examination stage to be inadequate for the post examination interrogation, the lower court suppressed the incriminating statements.

[2] In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court stated that a suspect's privilege against self-incrimination is jeopardized when he is placed in custody or his freedom is otherwise

deprived and he is subjected to questioning. Immediately prior to undergoing a "custodial interrogation," the suspect must be apprised of his *Miranda* rights. If the warnings are not given, any statement made during "custodial interrogation" cannot be used by the prosecution. *Miranda, supra.*

■ The *Miranda* court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Although there is some question whether Raico interrogated appellee, there was sufficient evidence that he was not in Raico's custody.

■ First, appellee was not under arrest. Following consultation with his attorney, appellee volunteered to take the polygraph examination. Although Corporal Raico was a state law enforcement officer, he was not operating in that capacity when he administered the exam to appellee, and no investigating officers were present. As a result, there was considerable corroboration for Raico's testimony that appellee could leave at any time and for appellee's signed statement that he "remained of [his] own free will knowing that [he] could leave at any time."

Appellee volunteered each of his answers. He had an opportunity to review questions and prepare his answers prior to the actual examination. There was sufficient evidence that the voluntary nature of appellee's statements continued during the post-examination stage when the self-incrimination occurred. These voluntary answers were additional evidence of the noncustodial nature of the post-examination period. The *Miranda* court itself recognized the admissibility of volunteered statements uttered without notice of constitutional warnings.

> The fundamental import of the privilege [against self incrimination] while an individual is in custody is not whether he is allowed to talk to the police without benefit of warnings and counsel, but whether he can be interro-

gated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Id.* at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

We are careful to note that practically all polygraph examinations are administered to a voluntary subject. A subject generally submits to a polygraph examination because he is suspected as a perpetrator, and the test results may exonerate him. If the subject denies culpability and the test results show deception, the subject's defense is not harmed because the results are inadmissible evidence. He voluntarily submits to the polygraph examination because, whatever the results, he does not place his position at risk.

It is true that appellee was not in "custody" during the post-examination stage. Nevertheless, we do not hold that *Miranda* warnings were not necessary for that reason alone. We look to additional factors which support our ultimate holding that appellee's constitutional rights were not abused, even though post-examination *Miranda* warnings were not given.

▮▮▮ Regardless of whether appellee was subjected to a custodial interrogation, it was not necessary for Raico to repeat *Miranda* warnings at the conclusion of the test because the earlier warnings were fresh. *Miranda* warnings need not be repeated at every stage of interrogation. *Commonwealth v. Dennis,* 451 Pa. 340, 304 A.2d 111 (1973); *Commonwealth v. Abrams,* 443 Pa. 295, 278 A.2d 902 (1971). Whether the warning must be repeated depends upon whether the objective indicia test indicates that the prior warning became stale. *Commonwealth v. Ferguson,* 444 Pa. 478, 282 A.2d 378 (1971).

In *Ferguson, supra,* a sixteen-year-old defendant was given *Miranda* warnings ten minutes after his arrest.

When interrogation began four and one-half hours later, the *Miranda* warnings were repeated. During the next five hours, the defendant was interrogated with reprieves only for allowing him to speak to relatives. At the end of the five hours, the defendant signed a statement which acknowledged an understanding of *Miranda* warnings. Shortly thereafter, the defendant issued an incriminating statement.

■ The defendant in *Ferguson* argued that the *Miranda* warnings should have been repeated when a detective, who was not present during earlier readings of *Miranda* rights, joined the five-hour interrogation in progress. In determining whether the earlier warnings had become stale at the moment the detective joined the interrogation, the *Ferguson* court applied the objective indicia test and considered 1) the time lapse between the warnings and the complained-of interrogation, 2) whether the complained-of interrogation occurred at the same location as the earlier warnings, 3) whether the same officer gave the warnings and conducted the interrogation, and 4) whether statements, immediately preceded by warnings, significantly differed from statements elicited during the complained-of interrogation.

In holding the earlier warnings sufficient, the *Ferguson* court found that:

> appellant received the *Miranda* warnings twice before the complained-of interrogation, once about seven and a half hours and again about three hours before the interrogation; all of the relevant events took place in the same room; Officer Kader, who had given appellant *Miranda* warnings, remained in the room during the interrogation by Detective Snyder; and there was only slight change between the information elicited by Officer Kader and that elicited by Detective Snyder.

*Id.*, 444 Pa. at 482, 282 A.2d at 379–380.

Here, less than three hours elapsed between the warning and the final incriminating statement. The warning and the discussion of the test results occurred in the same room. No other officers participated in the giving of warnings, the

test or the discussion that followed; Corporal Raico was the only officer who spoke with appellee. Although appellee changed his statement from unequivocal denial to an implication of guilt, his statements fell appreciably short of a confession. It is noted that there was a change in statements in *Ferguson* also.

■ Although not formally recognized in *Ferguson* as elements under the objective indicia test, we note the presence of counsel here and appellee's familiarity with criminal jurisprudence as indicated by his record and past incarceration. Since we consider the objective indicia test to be a test applying the totality of the circumstances, the four elements enumerated and applied in *Ferguson* are not exclusive. All factors relevant to the matter at hand are suitable for consideration, including appellee's assistance by counsel and his criminal experience. These are significant factors when considering the freshness of *Miranda* warnings and the suspect's understanding thereof.

Many of the dangers which *Miranda* sought to extinguish were not present here. For example, there was no evidence that Raico employed those traditional interrogation tactics recognized by *Miranda* as used by investigating officers to lure the suspect into a confession. Raico did not attempt to win appellee's confidence by suggesting that the victim deserved death, by rationalizing that an exercise of one's right to remain silent is actually an admission of guilt, by isolating appellee for a long period or by subjecting appellee to relentless questioning. Moreover, appellee was not under conditions which promoted fear or duress. His attorney was present during the early stages, and remained immediately outside the examination room during the actual test. Also, appellee was not arrested, handcuffed or otherwise detained.

We realize, of course, that the absence of these dangers does not forgive the administering of *Miranda* warnings prior to a true "custodial interrogation." We note them, however, as additional support for our application of the

objective indicia test and our holding that post examination *Miranda* warnings were not required here.

The lower court improperly relied upon *Henry v. Dees*, 658 F.2d 406 (5th Cir.1981), a case of similar import but with significant divergence. In *Henry,* the twenty-year-old defendant followed the advice of his attorney in agreeing to submit to a polygraph examination. The defendant was marginally mentally retarded, had an intelligence quotient of sixty-five to sixty-nine and read on the second grade level. The defendant, his counsel and the prosecutor executed a written agreement wherein the defendant waived his rights to counsel and to remain silent during the polygraph examination. The agreement further set forth that the defendant understood that any statements were admissible at trial without objection. During the polygraph examination, the defendant made inculpatory statements.

The totality of the circumstances in *Henry* indicated that the defendant did not effectively waive his constitutional rights. First, the examiner did not review the questions thereby allowing the defendant to object to phrasing. He presented questions once, demanded answers, immediately informed the defendant that he had failed and then badgered the defendant into telling the truth. Here, Raico reviewed the questions prior to the exam, explained the results and asked appellee for an explanation. He did not demand answers to leading questions.

Secondly, the mental deficiencies of the defendant in *Henry* made it unlikely that he remembered his warnings and understood the range and scope of a proper polygraph examination. Here there is no evidence that appellee's intelligence quotient and reading ability were considerably below norm. Moreover, he was familiar with criminal procedure and was four years older than the *Henry* defendant.

Next, when the examiner in *Henry* instructed the defendant that he had failed, the results were not processed. The examiner did not display charts or review the results; therefore, the defendant was not able to question the examiner's interpretation. Here, Raico displayed the charts and dem-

onstrated the evidence of deception prior to asking appellee to explain why he gave deceptive answers. Moreover, Raico used "deception" to describe the results, a more tactful and less intimidating word than "failed."

Moreover, the *Henry* court held that the examiner "interrogated" the defendant during the polygraph exam. This was demonstrated by his demand that the defendant "tell the truth about this thing." Having commenced interrogation, the *Henry* examiner was required to repeat *Miranda* warnings. Raico did not "interrogate" appellee; he neither assumed an aggressive posture nor pommeled appellee with rapid questioning. The record indicates that he simply discussed the test results and accorded appellee an opportunity to respond.

For these reasons, the lower court improperly held *Henry* to be persuasive.

We recognize that there is reason to question the propriety of Raico's statements and actions when he was alone with appellee for forty minutes following the actual examination; nevertheless, the only testimony was that he consumed that time running charts and "discussing" the test results with appellee.

Order reversed and case remanded for proceedings consistent with this opinion. Jurisdiction is relinquished.

CAVANAUGH, J., files a dissenting opinion.

CAVANAUGH, Judge, dissenting:

I respectfully dissent and would affirm on the basis of the well reasoned opinion by Kosik, P.J. of the court below. I would also add that the scope of review in an appeal by the Commonwealth from an order of suppression is limited to determining whether the factual findings of the suppression court are supported by the record and whether the legal conclusions drawn therefrom are correct. *Commonwealth v. Burgess*, 319 Pa.Super. 501, 466 A.2d 656 (1983). See also *Commonwealth v. Scaine*, 337 Pa.Super. 72, 486

A.2d 486 (1984). The findings of fact were supported by the record and the majority does not dispute them.

I am particularly disturbed that before the polygraph examination was started the defendant's counsel was requested to leave the room and was not permitted back until after the appellant made incriminating statements. The waiver signed by the defendant prior to the lie detector test was a broad form of waiver but also contained *specific reference to voluntarily submitting to the lie detector test.* The defendant waived his rights to have counsel present during the lie detector test. After reviewing the results of the test, the state police officer who conducted the examination told appellant that he did not believe he was telling the truth and then continued to interrogate the appellant without telling him that he had the right to have counsel present although defendant's counsel was outside the room where he remained at the instructions of the police.

In my opinion, once the polygraph examination was over the defendant should have been asked if he wanted his counsel to come back into the room. As the majority points out at page 4 of its opinion, it was not until 2:00 P.M., some *three hours* after the polygraph examination had begun that the defendant's attorney "was called back into the room." It was during the 40 minute period before defendant's counsel was asked to return, that he made the inculpatory statements.

With respect to the use of the polygraph examination, the court below succinctly stated the underlying reason why the defendant agreed to the examination: "The defendant was suspect, and the police offered him an opportunity to be exonerated." (Majority Opinion, page 340.) Without waiving his rights to counsel at the examination, the state police would not have given the defendant the "opportunity" to have the lie detector test indicate that he had no guilty knowledge of the criminal events involved. We must remember that the state police officer conducting the exami-

nation told the defendant that he would not be allowed to take the test if his counsel were present.

A further factor that shows lack of voluntariness to the defendant's statement is that defendant denied any complicity or knowledge pertaining to the crimes for over two and one half hours. It was only after the lie detector test ended and the police officer told defendant, in effect, that he failed the test did appellant inculpate himself. After the polygraph examination ended and the results were in the police officer shifted gears into an entirely new phase, as noted by the learned judge below, and this required a new warning.

The court's findings of fact are supported by the evidence and I find no error in the legal conclusions based on the findings of fact. Accordingly I would affirm the order suppressing defendant's statements.