**William Alvin SMITH, Petitioner,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic & Classification Center, Respondent.**

**Civ. A. No. 86–8–ATH.**

United States District Court, M.D. Georgia, Athens Division.

July 10, 1987.

J. Robert Daniel, Macon, Ga., Stephen H. Glickman, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., Stephen B. Bright, Atlanta, Ga., for petitioner.

Dennis R. Dunn, Asst. Atty. Gen., Atlanta, Ga., for respondent.

FITZPATRICK, District Judge.

This case is before the court on Petitioner's motion for a writ of habeas corpus. Because the court has concluded that Petitioner's habeas should be granted on one count contained in Petitioner's petition, the court will not address all of the other counts in the petition. The facts relevant to the count on which the habeas is granted are set forth below. The ground on which the court has decided to grant Smith's habeas concerns his waiver of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## I. FACTS

On September 14 and 15, 1981, in the Superior Court of Oglethorpe County, Georgia, Petitioner William Alvin Smith was tried on charges of malice murder and armed robbery. He was convicted on both counts and sentenced to death by electrocution for the offense of murder, and life imprisonment for the offense of armed robbery. The subsequent history of the case is set forth in Paragraphs 8 through 10 of Petitioner's petition for a writ of habeas corpus. Petitioner has properly followed all procedural prerequisites before filing in this court. *See* Document 4, filed January 29, 1986.

The death penalty sentence was based on the sole statutory aggravating circumstance that the murder "was outrageously or wantonly vile, horrible or inhumane in that it involved torture, depravity of mind, or an aggravated battery to the victim." O.C.G.A. § 17–10–30(b)(7) (1982). The circumstances of Petitioner's offense and trial were recently summarized by the United States Supreme Court as follows:

The Petitioner is mentally retarded, with an IQ of 65 and mental abilities roughly equivalent to those of a ten-year old child. He was tried for the murder of one Dan Turner, a friend of the petitioner and his family. There were no eyewitnesses to the crime. The petitioner had gone in to Turner's grocery store to buy some cigarettes. The petitioner testified at trial that he grabbed Turner when the latter opened the cash register. Turner reacted by picking up a hammer, and the petitioner then stabbed him and hit him with the hammer after it fell from the victim's hand. Petitioner took money from the cash register and Turner's wallet and fled.

Petitioner turned himself in to the police and gave a lengthy statement in which he admitted stabbing Turner. When asked about the reasons for his actions, petitioner stated that he had wanted to get money. At trial, however, petitioner stated that he had not entered the store intending to rob Turner, and did not know why he had grabbed Turner

as the latter was getting petitioner's cigarettes.

A psychiatrist who examined the petitioner stated that the petitioner showed considerable remorse in discussing the murder. Petitioner testified at trial that he 'didn't mean to kill Mr. Dan,' but had gotten 'carried away' after he saw the victim wielding the hammer in what petitioner interpreted as a threatening manner. There was evidence that the petitioner was under considerable stress in the days proceeding the murder. Petitioner's counsel argued that petitioner was insane or, at minimum, lacked the requisite mental intent because of his retardation. Nevertheless, the jury found petitioner guilty of malice murder and armed robbery and sentenced him to death.

*Smith v. Francis,* 474 U.S. 925, 106 S.Ct. 260–261, 88 L.Ed.2d 266 (1985) (Marshall J., dissenting from denial of certiorari).

It is undisputed that petitioner is mentally retarded, with an overall IQ that places him in the bottom 2.2% of the population. Fisher affidavit at 17. He has a mental age equivalent to that of a ten or eleven-year-old child. At the evidentiary hearing held in this court on October 30, 1986, Petitioner presented the testimony of two expert witnesses who stated that, given the totality of circumstances, Petitioner could not possibly have "knowingly" or "intelligently" waived his Fifth Amendment right to remain silent and have retained or appointed counsel. *See Miranda v. Arizona,* 86 S.Ct. at 1628 (1966). The expert witness whom Respondent called did not disagree with the express findings of Petitioner's two experts.

Smith confessed to the crime after being read his *Miranda* rights, but also after several other events transpired.

Smith was arrested late at night after hiding from the authorities all day in a wooded area. He emerged from the woods only after his father asked him, over a loudspeaker, to turn himself in. He was transported to another county from that of his residence and held incommunicado in a private cell overnight. He was not allowed to speak with his family or friends, nor did he request counsel. The next morning, Smith was allowed to eat breakfast, his first meal in almost twenty-four hours, and the custodial interrogation began. Sheriff Gene Smith, who was known to Petitioner, and a Deputy received Smith's confession. During the interrogation, the Sheriff called Smith by his nickname, "Noodle."

Petitioner's first witness, Dr. Everett Clark Kuglar is a board certified psychiatrist with professional credentials encompassing general, administrative and forensic psychiatry. Kuglar testified that after evaluating Smith, Kuglar concluded that Smith had an IQ of 65, which places Smith within the range of mental retardation. Tr. of Evid. hearing, Oct. 30, 1986, p. 33. Smith's IQ is "significantly subaverage." *Id.* at 34. Kuglar testified that:

> ... I think behavioral impairments or the inability to cope or adapt are related to the intellectual deficiency, but individuals who are retarded have a great deal of difficulty with adapting behavior, they have flawed judgment, flawed impulse control, they usually fairly easily become anxious and somewhat confused, they are usually rather dependent individuals who do not cope well in stressful situations.... I think [Smith's mental handicaps] substantially impaired [his] capacity to conform under situations, especially where he would be under stress.

*Id.* at 37.

> I think that this individual's intellectual limitations seriously question whether this man understood the consequences of confessing and whether or not he understood what his rights are. In our work with this man, you had to be very slow and very patient in describing things to him. It certainly appeared to me both from my evaluation of him and his testing that he understood that what he was doing was confessing, *but I don't believe the man had an intellectual appreciation of what this confession would mean to him, nor do I think most people with an IQ in this range would have such an appreciation unless it was very carefully explained to them.* What I

can't comment on, because I wasn't there, is how carefully it was explained to him, how slow they went with this, but unless this was done very patiently and very slowly, I don't believe he has the intellectual capacity to understand what it would mean to him.

*Id.* at 70–71 (emphasis added).

Petitioner's counsel questioned Kuglar on whether or not the testimony from the Sheriff and Deputy who examined petitioner indicated that the appropriate precautions had been taken. Kuglar responded that:

I didn't see anything in there to indicate they had taken this amount of time. They just indicated they had told him about it.

*Id.* at 71.

Dr. Kuglar did not testify that a mentally retarded person can *never* waive his *Miranda* rights. However, in Smith's case, his dependency needs would be such that "he would have a very hard time not just fulfilling the request of an individual that had known him for many years." *Id.* at 72. The custodial interrogation was, of course, performed by an individual who had known Smith for many years and even had a nickname for him.

Petitioner's second expert, Dr. Brad Fisher, is a clinical correctional psychologist who has testified extensively in death penalty cases on the sides of both petitioners and respondents. Fisher has also done extensive research in the area of death row inmates.

Dr. Fisher agreed with Dr. Kuglar that Smith was a "person who was more dependent than the next, he could not have held down any sort of sophisticated job, he had poor impulse control ..." Dr. Fisher's testimony with regard to Smith's waiver under *Miranda* is as follows:

Q. Now based on your evaluation of Mr. Smith and also on your review of the evidence presented at the confession suppression hearing in this case, do you have an opinion as to whether his mental retardation affected his ability to understand and weigh his rights before he made the confession that he made to the Sheriff following his arrest?

. . . . .

A. It's my perception and professional opinion that it was very stressful, that it would be for anybody; in his particular situation, perhaps exacerbated by a lot of time out in the woods, switch in the jurisdiction where he got taken over to the other jail. I've described before the tendency for a retarded person to be more dependent as a personality characteristic than the next person. I think all these things came into play when the next morning he was asked and given his rights and wrote his confession.

. . . . .

Q. Let me correct you. The record is that he did not write his confession.

A. It was written for him and signed by him. *I don't think that he did it knowingly and willingly.*

*Id.* at 152–153 (emphasis added).

Respondent's expert, Dr. Marcelo Delaserna, did not expressly disagree with Dr. Kuglar and Dr. Fisher as to their opinions of Smith's ability to knowingly and intelligently waive his rights. *Id.* at 223. In fact, Dr. Delaserna did not actually meet or test Smith himself. *Id.* at 222. His testimony was based solely on a review of the record. *Id.*

## II. CONCLUSIONS OF LAW

■ Under 28 U.S.C. § 2254(d), this court must afford a statutory presumption of correctness to the state court's factual findings on petitioner's petition for habeas corpus relief unless one of eight enumerated exceptions apply. However, the statutory presumption of correctness does not attach to the Georgia courts' determinations that petitioner validly waived his *Miranda* rights. *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The ultimate determination of a valid *Miranda* waiver is a mixed question of law and fact subject to a *de novo* review by this court. Although the United States Supreme Court has considered some of the issues in petitioner's habeas on a request

for certiorari from the decision of the Georgia Supreme Court, the impact of petitioner's mental retardation on his waiver of his *Miranda* rights has not been considered by any federal court.

In fact, the Georgia courts never made an express finding on the effect of Petitioner's retardation on the voluntariness of his waiver. The state habeas court merely noted petitioner's retardation and cited Georgia cases holding that evidence of impaired mental capabilities is not, by itself, sufficient to invalidate a confession. The state habeas court did not, however, address the impact of petitioner's particular mental handicaps under the facts before the court. Thus, this court must consider the "totality of circumstances" under which Petitioner's waiver of rights occurred to determine whether the waiver was "knowing and intelligent."

The central issue in this case is not whether the confession was voluntary in the traditional sense, but whether Smith's waiver of rights was knowing and intelligent, as required by the *Miranda* case. 86 S.Ct. at 1628. Several cases that constitute mandatory authority for this court indicate to the court that it has no other choice but to grant petitioner habeas corpus relief based on the lack of a "knowing and intelligent" waiver.

In *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) the court was faced with a situation similar to that in the instant case:

> Petitioner had been in the continuous custody of the police for over 8 hours and had not been fed at all during that time. He had not been given access to family, friends, or counsel at any point. He is an illiterate, with only a third grade education, whose mental capacity is decidedly limited. Under the circumstances, the fact that the police may have warned petitioner of his right not to speak is of little significance.

*Id.*, 88 S.Ct. at 525. The court concluded that petitioner's confession was invalid under *Miranda*.

The case of *Cooper v. Griffin* is even more compelling. 455 F.2d 1142 (5th Cir.

1972). The petitioners in *Cooper* were two brothers, Marvin and Archie Cooper, who were mentally retarded. Their level of reading comprehension was approximately on the second grade level, and the boys had estimated IQs of 60 or 61 to 67 or 68. The question presented to the *Cooper* court was whether the evidence in the record sustained a finding that the "high standards of proof for the waiver of constitutional rights were met...." *Id.* at 1144.

> The state merely offered the testimony of the arresting and interrogating officers that the full *Miranda* warnings had been given, and of the boys' appointed counsel that the boys 'appeared' to understand the situation. No effort was made to rebut the testimony of the witnesses as to the actual mental capacity of the boys.

*Id.* at 1145.

The court noted that limited mental ability and unfamiliarity with the criminal process are factors which weigh heavily against the voluntariness of a confession. *Id.* at 1145.

> The fact that the requisite warning has been given and a waiver obtained does not bar the courts from scrutinizing the circumstances of the confession to determine whether its admission comports with constitutional guarantees. The requirement of 'knowing and intelligent' waiver implies rational choice based upon some appreciation of the consequences of the decision ... Here, the boys surely had no appreciation of the options before them or of the consequences of their choice. Indeed it is doubtful that they even comprehended all of the words that were read to them. Thus, they could not have made a 'knowing and intelligent' waiver of their rights. Accordingly, the confessions are inadmissible.

*Id.* at 1146.

Other courts have also stressed the importance of a defendant's subnormal mental capability. *Henry v. Dees*, 658 F.2d 406 (5th Cir.1981) (Unit A), for example, involved a defendant similar to Petitioner who was "... twenty years old, an educable mental retardate with an IQ between 65

and 69, and reading skills on a second grade level." *Id.* at 407, n. 1.

In granting habeas corpus relief, the Court of Appeals said:

> When persons of markedly limited mental ability such as Henry, are questioned without the aid of counsel, issues 'of suggestibility and possible overreaching are raised ... and must be factored into a consideration of the totality of the circumstances.' *Jurek v. Estelle*, 623 F.2d 929, 938 (5th Cir.1980). Extra precautions must be taken. It must be painstakingly determined that they comprehend what events are transpiring. In addition, the presence of counsel should be assured absent an unmistakable, knowing waiver of that assistance.

*Id.*, 658 F.2d at 411.

■ The uncontradicted evidence before this court demonstrates that petitioner's waiver of his *Miranda* rights was not knowing or intelligent. Petitioner's reading and verbal comprehension are extremely poor, as are "his memory, reasoning abilities, and similar skills that would be essential for making a realistic acknowledgment and waiver of his rights, and in properly giving a statement." Fisher affidavit, pp. 18–19.

Counsel for Respondent argues that Petitioner's case is distinguishable from the *Cooper*, *Henry*, and *Sims* cases in that the experts in those cases testified that the respective petitioners could never understand a *Miranda* warning. In this case, the experts testified that Smith could possibly understand a *Miranda* warning if it were properly explained to him and the proper time were taken. The court finds these distinctions to be without merit because, based on the totality of circumstances, Smith did not receive even the time and explanation that the experts feel he needed to understand the implication of his waiver of rights. The length and circumstances of petitioner's detention, coupled with his heightened susceptibility to suggestion, cast doubt on the validity of his waiver and of his confession. Petitioner was arrested late at night. He had been hiding out in the woods all day, and came out of the woods only after his father got on a megaphone and talked him into coming out. In a state of hunger and exhaustion he was taken immediately to a jail in another county. There he was held for 12 hours, incommunicado, in a private cell. He was then taken, alone, and placed in the custody of two law enforcement officers. One of these officers had known Petitioner since childhood and called him by his nickname, Noodle. In light of the expert testimony and the clear precedent of this circuit, the court feels that it has no other choice but to find that the confession was not made knowingly and intelligently, and is thus invalid.

■ Respondent argues that Smith had one prior conviction, and because of that conviction, he was familiar enough with the criminal justice system to understand his *Miranda* rights. Although the court realizes that this factor is relevant in evaluating the knowing and intelligent nature of confession under the "totality of circumstances" test, this is not sufficient to persuade the court that he fully understood the nature of the potential effects of his confession, especially that the confession could be given to the jury who would determine whether or not Smith should be sentenced to death.

Respondent relies on the case of *Colorado v. Connelly*, — U.S. —, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), arguing that its holding validates Smith's confession. The petitioner in *Connelly* approached a police officer and stated that he had murdered someone and wanted to talk about it. At that point, the officer advised Connelly of his *Miranda* rights, and Connelly said that he understood the rights but wanted to talk about the murder. A psychiatrist testified that Connelly was suffering from psychosis that interfered with his ability to make free and rational choices and that motivated his confession, although it did not prevent him from understanding his rights. The United States Supreme Court concluded that this confession was not involuntary.

The *Connelly* case can be distinguished from the facts *sub judice*. Smith was in a situation of custodial interrogation, where-

as Connelly voluntarily approached a policeman on the street to confess. Further, *Connelly* deals primarily with the voluntary requirement of *Miranda* as opposed to the knowing and intelligent portion of the *Miranda* requirement. The court does not doubt that Smith's confession was given under his own free will, but the court finds that Smith did not knowingly and intelligently confess and waive his right to counsel. Thus, the Connelly case does not mandate that this court deny petitioner's habeas.

Respondent also relies on the case of *Corn v. Zant,* 708 F.2d 549 (11th Cir.1983). The Eleventh Circuit in *Corn* considered the question of whether Corn's low IQ and history of emotional problems had such an impact on his confession as to render it involuntary. Again, the court focused mainly on whether *Corn's* confession was voluntary as opposed to whether it was knowing and intelligent. In a relatively brief paragraph, the court concluded that under the "totality of the circumstances" Corn's inculpatory statement was voluntary. *Id.* at 567.

> Although Corn was of below average intelligence, he admitted that he was familiar with the criminal process and he understood the policeman's statements to him.

*Id.* On the contrary, the expert testimony concerning Smith indicates that, even in light of one prior arrest, Smith did not receive the benefit of special precautions sufficient for him to make a knowing and intelligent waiver of his rights.

■ Having concluded that the confession was invalid, the court must further consider the impact of this conclusion on Smith's conviction. The evidence in support of Smith's convictions for murder and armed robbery are overwhelming. In addition to Smith's confession, the prosecution presented a witness who had seen Smith run out of the store immediately after the murder occurred and who heard him say "I just killed Mr. Dan." Smith testified at trial as to the circumstances of the murder and armed robbery. In light of this overwhelming evidence of Smith's guilt as to

the murder conviction and the armed robbery conviction, the admission of Smith's confession of guilt was harmless error. *See United States v. Packer,* 730 F.2d 1151 (8th Cir.1984); *United States v. Roper,* 681 F.2d 1354 (11th Cir.1982), *cert. denied, Newton v. United States,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983); *United States v. Smith,* 635 F.2d 411 (5th Cir.1981); *Wilson v. Henderson,* 584 F.2d 1185 (2nd Cir.), *reh'g denied,* 590 F.2d 408 (2nd Cir.), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1978).

■ However, the court recognizes that Smith's confession may have played some part in the jury's decision to sentence Smith to death rather than to life imprisonment. In light of the serious nature of the death penalty, the court cannot hold that the admission of Smith's confession was harmless error insofar as his sentencing is concerned. Smith's testimony on the stand at trial, though admitting guilt for the commission of the acts themselves, was substantially more sympathetic than was his matter-of-fact written confession on the violent acts he had committed. Smith testified at trial that he did not enter the store with the intention of robbing it, and that he must have just gotten "carried away" when he killed "Mr. Dan." His confession, on the contrary, was that he "just grabbed him, he started resisting me and I pulled knife out of back pocket and started stabbing him he was still scuffling until he fell at back. He had hammer I kept stabbing him until he dropped hammer. I picked up hammer and hit him twice with it.... The reason for my actions, I was trying to get money for another car...."

This testimony is much more likely to support a jury's finding of an aggravating circumstance than is Smith's confused on-the-stand testimony that he "didn't know" what he was doing, and that he didn't go to the store to rob Mr. Dan, but that he just got carried away. Tr. pp. 287–297. Smith's live testimony showed much more remorse than did his confession. The introduction of Smith's written confession, in sum, may have had a substantial impact on

the jury's finding of the statutory aggravating circumstance.

The death penalty has been with us since the dawn of history. As civilization has evolved, the offenses for which the penalty has been imposed have slowly but systematically been reduced until today capital punishment is allowed only for those murders that involve one or more aggravating circumstances. No social issue has so polarized people of good will and judgment as has the propriety, in a civilized society, of taking another's life by the state as punishment for a crime, albeit a wanton and aggravated murder. The Supreme Court of the United States has ruled that the death penalty is constitutionally permissible provided certain prerequisites are met. The basic underlying philosophy seems to be that since the death penalty is the most drastic penalty that the law can impose, it should only be applied sparingly and in the most aggravated cases. There is great debate as to whether or not it serves as a deterrent to others similarly inclined, but there seems to be general acceptance for the proposition that one upon whom the death penalty is imposed have an awareness of the severity of the sentence and be able to ponder upon his fate. No justification can be had for the execution of a child of ten or eleven years of age in any society that considers itself civilized. If a child of ten or eleven should not be executed under any circumstances, then surely a person who may have a chronological age of twenty, but a mental and emotional age of ten or eleven, should not be put to death because he was not "street wise" enough to remain silent until he had conferred with a lawyer.

The rationale for the *Miranda* decision was to put all criminal defendants on equal (or nearly so) footing when deciding whether to talk to the authorities before getting the advice of a lawyer. Regardless of what one may think of *Miranda*, it is the law and if it is to be read logically, it cannot say that all defendants are equal when deciding whether or not they should talk to a lawyer before confessing. Some defendants are very intelligent and aware of all of their rights, others are so lacking in basic intelligence that they cannot possibly waive their constitutional rights without additional precautionary instructions.

Petitioner urges that this court also reverse the death sentence on the grounds that a mentally retarded person with an IQ of 65 and the intelligence of a ten-year-old child could not possibly understand the punishment that was being meted out and, therefore, it is cruel and unusual punishment to execute such a person regardless of any issue of waiver of *Miranda* rights. The court does not address this issue in this order, as it is unnecessary since the death sentence is being reversed on clearer, more substantive grounds. The court does note, however, that if the state should not execute a mere child then, quite possibly, the state should not execute one who is so mentally retarded that they have the judgment, emotions and intelligence of a ten-year-old. That decision, however, will be left for another day.

Petitioner's petition for writ of habeas corpus is hereby GRANTED. Respondent is ordered to, within 180 days, conduct a new trial on the sentencing phase of petitioner's conviction.