William Alvin SMITH,
Petitioner-Appellant,
Cross-Appellee,

v.

Walter ZANT, Warden, Georgia Diagnostic and Classification Center,
Respondent-Appellee, Cross-Appellant.

No. 88–8436.

United States Court of Appeals,
Eleventh Circuit.

Aug. 26, 1988.

Stephen H. Glickman, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., Stephen B. Bright, Atlanta, Ga., for petitioner-appellant, cross-appellee.

William B. Hill, Jr., Dennis R. Dunn, Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee, cross-appellant.

Before KRAVITCH, HATCHETT and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

## I.

William Alvin Smith, a Georgia prisoner, was convicted of armed robbery and malice murder and was sentenced to death for the offense of murder. On the morning of June 8, 1981, Smith walked from his home in Lexington, Georgia to a grocery store and service station owned by Daniel Lee Turner, an 82–year–old man known to Smith as "Mr. Dan." Only Smith now knows what happened inside the store, but it is not disputed that within a few minutes after Smith entered the store, Turner was lying unconscious in a pool of blood, having been stabbed seventeen times and beaten with a hammer.

Immediately after the attack on Turner, Smith noticed that his friend Willie Robinson was standing outside the door to Turner's store. Robinson did not enter the store, but Smith went to the door, which was open, and told Robinson, "Damn, I think I killed Mr. Dan," or words to the same effect. Smith asked Robinson not to tell anyone about the killing, but Robinson immediately left to inform the police. Smith then went back inside Turner's store, removed Turner's wallet, took money from the cash register, and fled, carrying the hammer with which he had attacked Turner. Eyewitness testimony by John Collins, who had stopped with his coworker Rita Ridgeway to purchase gasoline from Turner, established that Smith ran across the highway on which Turner's store was located.

Turner died at 8:10 p.m. that evening. Later that night, Smith surrendered to the police and was removed to the jail in Clarke County, which is adjacent to Oglethorpe County, where Smith resided and where the crime took place. The police advised Smith of his constitutional rights upon his surrender but did not question him until the next morning, after Smith had eaten and had an opportunity for sleep. At no point, however, did Smith meet with members of his family, and he was detained in a different county from the one in which his family resided.

On the morning of June 9, Sheriff Gene Smith and Deputy Sheriff John Cartee again advised Smith of his constitutional rights. Smith declined consultation with an attorney and, after stating that he understood his constitutional rights, gave the following statement:

I, William Allen [sic] Smith, make the following statement. I left home and went to my aunts, Ruby Dorsey. I left my aunts and went to John Howard Woods. I left John Howard and started walking through Black Bottom toward Lexington to go to Mr. Dan's store. I asked for a pack of cigarettes and saw he was by his self. I then grabbed him. He started resisting me and I pulled knife out of back pocket and started stabbing him. He was still scuffling and he fall at back of store. He had a hammer. I kept stabbing him until he dropped hammer. I picked up hammer and hit him twice with it. I heard something come to door. I went to door and saw Willie Robinson and I told him I had killed Mr. Dan. I went back in store from front door and got money from cash register and out of Mr. Dan's pocket. I then ran back up Black Bottom. I took my shirt and wrapped it around my hand that was bleeding, and also the hammer. I threw them on side of road up the street as I was running. I make this statement voluntarily without threat or promise of my own free will.

This confession was written down by Cartee and signed by Smith. Smith then made the following statement, which Cartee wrote on the back of the confession: "The reason for my actions, I was trying to get money for another car."

A grand jury charged Smith with malice murder[1] and armed robbery.[2] The state trial court held a hearing on the admissibility of Smith's confession, at which Sheriff Smith and Deputy Cartee testified. After

---

1. *See* O.C.G.A. § 16–5–1(a).

2. *See* O.C.G.A. § 16–8–41(a).

considering their testimony, the court concluded "that the statement was freely and voluntarily made, with knowledge, et cetera" and allowed its admission. At trial, the state introduced the confession and a waiver of rights form signed by petitioner.

Smith took the stand on his own behalf and gave an account of the occurrences inside Turner's store. Although Smith's testimony is difficult to follow on a cold record, it is certain that he admitted stabbing and beating Turner. Smith's testimony differed in significant details, however, from the confession given to Sheriff Smith and Deputy Cartee. According to Smith's testimony, he asked Turner for a pack of cigarettes. Turner turned around to reach for the cigarettes, and Smith touched him on the shoulder for an unexplained reason. As Smith touched Turner, he noticed that Turner had a hammer in his hand, but Smith "[didn't] know where the hammer come from, off the counter or from where, you know." Smith testified that Turner "grabbed that hammer, you know, he started forcing his self, you know, and I got carried away.... All I know, I was stabbing. That's all.... [H]e started to the back and then he fell, and when he fell, the hammer, it fell, too, and I guess I picked the hammer up and hit him with it." Smith denied that he had intended to rob Turner when he entered the store and testified that he took Turner's wallet and the money in the cash register after encountering Willie Robinson.

Defense counsel then asked Smith whether he had any other statement to make to the jury. Smith replied, "Yes. I didn't mean to kill Mr. Dan and I ain't had nothing against Mr. Dan or nothing, and I'm sorry I did it." Smith further said that Turner had always been friendly to him and his family, and that he had frequently been in Turner's store but had never before stolen anything.

The jury found Smith guilty of both charges, implicitly rejecting his defenses of insanity and lack of intent to kill. After hearing further testimony at the sentencing phase of the trial, the jury accepted the state's contention that the murder of Turner was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," see O.C.G.A. § 17–10–30(b)(7), and imposed the death sentence.

Smith unsuccessfully appealed to the Georgia Supreme Court. *Smith v. State,* 249 Ga. 228, 290 S.E.2d 43, *cert. denied,* 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). He also attempted, without success, to secure post-conviction relief from the Georgia state courts. *Smith v. Francis,* 253 Ga. 782, 325 S.E.2d 362, *cert. denied,* 474 U.S. 925, 106 S.Ct. 260, 88 L.Ed.2d 266 (1985). Smith then filed a petition for habeas corpus in the United States District Court for the Middle District of Georgia. His petition alleged numerous grounds for relief from both his conviction and his sentence of death, including ineffective assistance of counsel, denial of an impartial jury, and improper introduction of his confession in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The district court held an evidentiary hearing on Smith's mental state during the period of the crime and immediately thereafter. Smith presented the testimony of Dr. Everett Kuglar, a board certified psychiatrist, and Dr. Brad Fisher, a clinical correctional psychologist, both of whom had examined Smith. The state introduced the testimony of Dr. Marcelo DeLaserna, an expert in psychological testing, who had not met or tested Smith. The testimony by Smith's experts tended to establish that Smith was mentally retarded and under severe stress during the pertinent period, and that Smith could not have waived his *Miranda* rights knowingly or intelligently if the nature of the rights and the consequences of waiver had not been slowly and painstakingly explained to him in a stress-free environment. The state's expert did not expressly disagree with this conclusion.

The district court issued a memorandum opinion holding that Smith had not validly waived his *Miranda* rights when he gave a confession to Sheriff Smith and Deputy Cartee. *Smith v. Kemp,* 664 F.Supp. 500

(M.D.Ga.1987). The district court further concluded that the introduction of Smith's confession was harmless error as to his conviction because "[t]he evidence in support of Smith's conviction for murder and armed robbery [is] overwhelming." *Id.* at 506. The district court did not believe, however, that the confession was harmless as to Smith's sentence of death, noting that when Smith took the stand at his trial, "[his] testimony ... was substantially more sympathetic than was the matter-of-fact written confession on the violent acts he had committed." *Id.* The district court therefore granted the writ of habeas corpus as to the death sentence, subject to the state's conducting a new sentencing hearing.

As Smith did not abandon his other grounds for relief, the state asked the district court to reach the remaining claims. The district court declined to do so, citing considerations of judicial economy. The state consequently sought appellate review of the district court's order granting habeas corpus based on the *Miranda* claim, and Smith cross-appealed from the district court's conclusion that the *Miranda* violation was harmless as to his conviction.

Neither party, however, requested that the district court expressly determine that there was no just reason for delay and expressly direct the entry of a final judgment on the *Miranda* claim. *Cf.* Fed.R. Civ.P. 54(b). In the absence of such a determination and direction by the district court, any order adjudicating fewer than all the claims of the parties in a suit is not a final judgment appealable as of right under 28 U.S.C. § 1291. *See In re Yarn Processing Patent Validity Litigation*, 680 F.2d

1338, 1339 (11th Cir.1982) (per curiam). This court accordingly concluded that it lacked jurisdiction over the appeal and cross-appeal. *Smith v. Kemp*, 849 F.2d 481 (11th Cir.1988) (per curiam).[3]

After dismissal of the appeals, the parties expeditiously sought, and the district court expeditiously granted, certification under Fed.R.Civ.P. 54(b) that there was no just reason for delay and that final judgment should be entered on the *Miranda* claim. Smith filed a notice of appeal from the district court's denial of habeas corpus as to the conviction, and the state cross-appealed from the grant of the writ as to the sentence.[4] Following the procedure adopted in *In re Yarn Processing Patent Validity Litigation*, 680 F.2d at 1340, Smith moved that the appeals be decided on the record, briefs, and oral argument submitted to the panel in the parties' prior attempted appeal. *See Smith v. Kemp*, 849 F.2d at 483–84. We granted Smith's motion, and as we now have jurisdiction, we proceed to the merits of the case.

## II.

The only claim on which the district court directed the entry of final judgment, and thus the only claim presented for consideration by this court, is the validity *vel non* of Smith's waiver of his *Miranda* rights. A panel of this court recently emphasized that the validity of a suspect's waiver of his *Miranda* rights is an issue distinct from the voluntariness of a confession. *See Miller v. Dugger*, 838 F.2d 1530 (11th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). The district court correctly understood this dis-

---

**3.** We rejected the state's suggestion that we had jurisdiction under *Blake v. Kemp*, 758 F.2d 523 (11th Cir.), *cert. denied*, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985), and *Wilson v. Kemp*, 777 F.2d 621 (11th Cir.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). In *Blake* and *Wilson*, both death penalty cases, this court held that the state could appeal a district court order granting the writ of habeas corpus, even though the district court had not addressed all the claims raised by the petitioner, because the district court's order "gave the petitioner all he could hope to achieve by the litigation." *Blake*, 758 F.2d at 525. We noted that

Smith had not obtained "all he could hope to achieve" because the district court had denied the writ as to his conviction but had declined to reach his other grounds for attack on the conviction. *Smith v. Kemp*, 849 F.2d at 483.

**4.** Smith is thus appellant and cross-appellee in this second appeal, and the state is now appellee and cross-appellant. To avoid confusion with the first, abortive appeal, in which the parties' positions were reversed, we shall refer to Smith as "Smith" or "petitioner" and to the state solely as "the state."

tinction. *See Smith v. Kemp,* 664 F.Supp. at 504.

"The inquiry [into the validity of a waiver] has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (citations omitted). In particular, "[t]he determination of whether there has been an intelligent waiver ... must depend in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *see Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628 (applying *Johnson v. Zerbst* standard to waiver of

*Miranda* rights); *Miller v. Dugger,* 838 F.2d at 1537–38 (same). The ultimate question of the validity of a suspect's waiver of his *Miranda* rights is " 'a legal question requiring an independent federal determination,' " *Lindsey v. Smith,* 820 F.2d 1137, 1150 (11th Cir.1987) (quoting *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985)), not an issue of fact on which a presumption of correctness would apply to a determination by a state court. *Cf.* 28 U.S.C. § 2254(d).

The record in this case compels the conclusion that Smith did not intelligently waive his *Miranda* rights.[5] Dr. Kuglar testified that Smith had a mental age of 10 or 11 and an intelligence quotient (IQ) of approximately 65, placing Smith in the bottom two percent of the population. According to Kuglar,

[T]his individual's intellectual limitations seriously question whether this man understood the consequences of confessing and whether or not he understood what his rights are. In our work with this man, you had to be very slow and patient in describing things to him. It certainly appeared to me both from my evaluation

---

5. The state urges that the district court erred in failing to accord the state courts' factual conclusions a presumption of correctness, as required by 28 U.S.C. § 2254(d). We agree with the district court that the presumption of correctness is inapplicable to the central issues in this case. First, as explained in the text, the validity *vel non* of the waiver of constitutional rights is a legal question, not an issue of fact. Second, the state trial court that heard Smith's suppression motion made no factual findings, explicit or implicit, about Smith's retardation or its effect on his capacity to waive his rights. *See Townsend v. Sain,* 372 U.S. 293, 313–14, 83 S.Ct. 745, 757–58, 9 L.Ed.2d 770 (1963) (state court must actually reach and decide issues of fact for presumption of correctness to apply). Third, after reviewing the proceedings before the state habeas court, we conclude that "it is unclear whether the state finder applied correct constitutional standards in disposing of the claim.... Since the decision of the state trier of fact may rest upon an error of law rather than an adverse determination of the facts, a hearing [was] compelled to ascertain the facts." *Id.* at 314, 83 S.Ct. at 758. The state habeas court's order suggests that it conflated the issues of voluntariness and waiver and failed to focus sufficiently on the issue of Smith's ability to make an intelligent

waiver. The state habeas court also may have interpreted controlling Georgia cases to hold that the mere existence of a defendant's mental limitations, "without more," does not render the defendant incapable of waiving constitutional rights. *See Donaldson v. State,* 249 Ga. 186, 289 S.E.2d 242, 245 (1982); *Parker v. State,* 161 Ga.App. 478, 288 S.E.2d 297, 298 (1982). If the state habeas court extracted from these cases a constitutional rule that proof of a defendant's mental limitations would always be legally insufficient to establish the invalidity of a waiver, the rule is inconsistent with the flexible approach required by *Johnson v. Zerbst,* 304 U.S. at 468, 58 S.Ct. at 1024–25. We have previously given great weight to a defendant's mental retardation in concluding that his waiver of constitutional rights was invalid. *See, e.g., Cooper v. Griffin,* 455 F.2d 1142, 1145 (5th Cir.1972) (binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)). *But cf. Dunkins v. Thigpen,* 854 F.2d 394 at 399–400 (11th Cir.1988) (mental retardation did not invalidate defendant's waiver of *Miranda* rights, in light of testimony that defendant had no difficulty communicating with counsel and psychiatric report concluding that defendant had adequate judgment, insight, memory, and attention span).

of him and his testing that he understood what he was doing was confessing, but I don't believe the man had an intellectual appreciation of what this confession would mean to him, nor do I think most people with an IQ in this range would have an appreciation unless it was very carefully explained to him. What I can't comment on, because I wasn't there, is how carefully it was explained to him, how slow they went with this, but unless this was done very patiently and slowly, I don't believe he has the intellectual capacity to understand what it would mean to him.

Under questioning from the district court, Kuglar repeated his conclusion that "it would be very unusual with a person of this IQ to be able to intelligently appreciate what he is doing when his Miranda rights are read to him." Kuglar further testified that Smith had low verbal abilities and would have had difficulty understanding the language of the Miranda warnings. Moreover, although Kuglar did not believe that Smith would have confessed to committing an act that he had not done, Kuglar did think that Smith was sufficiently suggestible that "it would be fairly easy to moderate this man in the lines of exactly what you might want him to say if it was in the general area of what had occurred."

Kuglar's conclusions were confirmed by Dr. Fisher. Fisher reported that when he conducted psychological tests on Smith, "you had to repeat everything and give the questions to him extremely slowly." Fisher was unable to complete a Minnesota Multiphasic Personality Inventory test of Smith because Smith did not have the sixth- to eighth-grade reading ability necessary to take the test. Fisher believed that "you have to go about giving [Smith] the information in that [Miranda] waiver much more carefully; in other words, he comes in with a deficit of understanding so that you have to overcompensate through a careful explanation of all the terms and reading it slowly and other things that will compensate for that handicap." Fisher agreed with Kuglar that Smith was seriously deficient in verbal skills, and he confirmed that, because Smith was suggestible and would do what he perceived an authority figure would want him to do, "you have to be doubly careful to make sure that he's really understanding [the Miranda waiver] and not just showing his dependent characteristic to an authority figure in a stressful situation."

The state does not dispute the general proposition that a suspect's mental limitations can interfere with his capacity to make an intelligent waiver of the Miranda rights. Rather, the state argues that "the Petitioner's own experts testified that the Petitioner was fully capable of understanding the Miranda warnings if they were given in a fashion recommended by the Petitioner's witnesses.... Neither of the witnesses who testified for the Petitioner before the district court [was] present either when the Petitioner actually gave the statement or when the trial court, judging the credibility of the witnesses, held the *Jackson-Denno* [6] hearing.... Neither could say for a fact that the Miranda warnings were given in a manner which the Petitioner could not understand."

The state's argument is flawed in three respects. First, Smith's experts did *not* state that Smith would be "fully capable of understanding the Miranda warnings" if they were explained slowly. They testified to the inverse of that proposition, that Smith would not be capable of understanding the warnings if they were not explained slowly. The state's conclusion does not necessarily follow from the experts' testimony. Although the experts rejected the notion that a mentally retarded suspect would never be able to make an intelligent waiver of rights, they did not give their assurance that Smith himself would have been "fully capable" of validly waiving the Miranda rights even under

---

**6.** *See Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (when defendant challenges voluntariness of confession, due process requires that trial judge make independent determination that confession is voluntary before permitting it to be heard by the jury).

ideal circumstances.[7]

Second, Dr. Fisher's testimony arguably implied that, given the stressful situation in which Smith found himself, Smith could not have waived his rights intelligently even if the rights had been explained to him carefully. After Fisher explained the phenomenon of "shock response," which mentally retarded persons commonly experience when they encounter stress, the district court asked, "[D]o you feel that [Smith] was retarded to such a degree that he could not intelligently waive his right to counsel, etcetera?" Fisher replied, "Right. If I did testify to that, I would like to take it back, because what I mean to say, *my belief is that with excessive stress he could not.*" Fisher believed that Smith was under severe stress from the loss of his girlfriend and his car even before he killed Turner, and that Smith's stress, "confusion, disorientation, and need for direction" were exacerbated by his commission of the crime, his flight, and his incarceration overnight in another county without communication from his family.[8]

Third, a fair reading of the record indicates that Sheriff Smith and Deputy Cartee did not explain the *Miranda* rights to petitioner slowly and carefully. At the *Jackson-Denno* hearing, Sheriff Smith testified, "We read his rights to him. We asked him did he understand them. He said he did, and he signed it...." Sheriff Smith also stated, "I believe the [petitioner] read [the rights form] his self. I asked him did he understand it and he said he did." Conspicuous by its absence, in our view, is any hint that Sheriff Smith and Deputy Cartee were "doubly careful" in ensuring that petitioner understood his rights, particularly as Sheriff Smith testified that the entire process of securing Smith's waiver and confession took "not over thirty minutes at the longest." [9]

■ The state also argues that Smith previously had been charged with burglary and forgery by Sheriff Smith and thus had experience with the criminal justice system sufficient to apprise him of the meaning of the *Miranda* warnings. The state thus seeks to distinguish this case from *Cooper v. Griffin,* 455 F.2d 1142 (5th Cir.1972), which involved two retarded teenage boys without prior experience with the criminal process. We agree with the state that prior experience with criminal justice may be relevant in determining whether a waiver of constitutional rights is valid, *see Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979), but we find no evidence on the record to convince us that the prior prosecution of Smith was particularly important in this case. The state offered no testimony to rebut the deeply pessimistic opinions of Smith's experts about Smith's capacity to understand and waive his rights. Indeed, when counsel for the state questioned Dr. Fisher on

---

7. Dr. Fisher did testify that if the *Miranda* warnings "were read slowly and carefully *in a non-stressful situation,* yes, he could comprehend and willingly and knowingly—in other words, he had that ability." Fisher carefully limited his response to non-stressful situations, which, in his opinion, the post-arrest interrogation was not.

8. The state argues that we should disregard the testimony of Dr. Fisher because the state habeas court, which had Dr. Fisher's affidavit, implicitly made an adverse determination as to Dr. Fisher's credibility when it rejected Smith's *Miranda* claim. We disagree. Although the credibility of a witness is a factual determination to which federal courts must accord a presumption of correctness under 28 U.S.C. § 2254, the state habeas court's rejection of Smith's *Miranda* claim did not necessarily comprise a rejection of Fisher's credibility. Rather, as explained *supra* note 5, the state court may have

rejected Smith's claim because it applied an erroneous rule of law to Smith's claim. Furthermore, we fail to see how the state habeas court could have made a decision on Fisher's credibility when Fisher never gave oral testimony. We previously have expressed doubts as to whether a credibility determination can be fairly made on a paper record. *See Agee v. White,* 809 F.2d 1487, 1494 n. 3 (11th Cir.1987).

9. Deputy Cartee's testimony at trial was to a similar effect: "He said he was willing to talk. In fact, Sheriff Smith asked him, I believe it was twice, on two different occasions, did he want an attorney and he said no, he did not.... He was simply asked did he want to make a statement, and he gave us the full statement which was written down and he signed.... After the statement was complete, I first read it back to him. Then it was given to him to look over before he signed it.... He read it and said he understood it."

this issue, Dr. Fisher resisted the suggestion that prior experience would be especially helpful to a retarded person's understanding of constitutional rights:

Q: In your experience, do you find that repeat offenders are more knowledgeable regarding, first of all, the trial system? Have you had any experience with that?

A: I have had some experience with that, and to some extent that's true; *to a much lesser, if any extent, with a person who is retarded, obviously,* but you didn't—you know, you didn't classify it to just retarded people, so for that whole group, yes, one learns from experience, so if they've been through the process before, they are more familiar with it.

Accordingly, we conclude that petitioner did not intelligently waive his *Miranda* rights.

### III.

We next consider whether the introduction of Smith's confession was harmless error as to Smith's conviction. "If, upon its reading of the trial record, the appellate court is firmly convinced that the evidence of guilt was so overwhelming that the trier of fact would have reached the same result without the tainted evidence, then there is insufficient prejudice to mandate the invalidation of the conviction." *Cape v. Francis,* 741 F.2d 1287, 1294–95 (11th Cir.1984), *cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985).

 The district court found overwhelming evidence to support Smith's conviction for murder. The court noted that Smith confessed the killing to Willie Robinson and that Smith testified to the circumstances of the crime at trial. Certainly there was

overwhelming evidence that Smith *killed* Turner; Smith never disputed this point. Smith was not charged with Turner's slaying, however, but with the offense of malice murder. The harmless-error analysis requires consideration of the elements of malice murder, the charges to the jury, and the possible existence of lesser included offenses, as well as the amount of proof adduced at trial.

Georgia defines the crime of malice murder as follows:

(a) A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.

(b) Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

O.C.G.A. § 16–5–1. Several decisions of this court and the Georgia courts establish that intent to kill is an essential element of the crime of malice murder. *See, e.g., Lamb v. Jernigan,* 683 F.2d 1332, 1336–37 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983); *Mason v. Balkcom,* 669 F.2d 222, 224 (5th Cir. Unit B 1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983);[10] *Parks v. State,* 254 Ga. 403, 330 S.E.2d 686, 696 (1985); *Patterson v. State,* 239 Ga. 409, 238 S.E.2d 2, 8 (1977). The trial court in this case instructed the jury that intent to kill was a "necessary ingredient" to the crime of malice murder.[11] Because Smith

---

**10.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this circuit adopted as binding precedent decisions issued by Unit B of the former Fifth Circuit after September 30, 1981.

**11.** A separate line of Georgia cases holds that malice murder may be proven by circumstances which demonstrate a reckless disregard for human life, *see, e.g., Flynn v. State,* 255 Ga. 415, 339 S.E.2d 259, 262 (1986); *Walden v. State,* 251 Ga. 505, 307 S.E.2d 474, 475–76 (1983), under

the theory that "[a] wanton and reckless state of mind is sometimes the equivalent of a specific intent to kill," *Myrick v. State,* 199 Ga. 244, 34 S.E.2d 36, 39 (1945) and thus may satisfy the requirement of an "abandoned and malignant heart." 40 Am.Jur.2d *Homicide* § 51 (1968). The trial court did not instruct the jury on this theory of murder, but rather charged the jury that intent to kill was an essential element of malice murder. Nor did the trial court instruct the jury on the theory of felony murder. *Cf.* O.C.G.A. § 16–5–1(c).

conceded that he committed the actual killing, *"the* essential element" of the crime was his intent to kill. *Cf. Brooks v. Kemp,* 762 F.2d 1383, 1393 (11th Cir.1985) (en banc), *vacated and remanded for further consideration,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated on remand,* 809 F.2d 700 (11th Cir.) (en banc), *cert. denied,* — U.S. ——, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987); *Mason v. Balkcom,* 669 F.2d at 227. We must therefore focus on whether the erroneous admission of Smith's confession contributed to the jury's conclusion that Smith intended to kill Turner.

In cases involving burden-shifting instructions on the issue of intent to kill, we have stated that "a defense of accident or lack of intent not only places the element of intent in issue, but substantially reduces the extent to which evidence against the defendant can be considered to be 'overwhelming.'" *Carter v. Montgomery,* 769 F.2d 1537, 1541 (11th Cir.1985). Moreover, "[b]ecause confessions carry 'extreme probative weight,' the admission of an unlawfully obtained confession rarely is 'harmless error.' In fact, we have ruled the admission of an unlawful confession is harmless only in limited instances, such as where there was in evidence at least one other lawful confession by the defendant." *Christopher v. Florida,* 824 F.2d 836, 846 (11th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).[12]

■ In this case, the improper admission of Smith's confession might have made a considerable difference. Smith's confession to the police was the only "direct" evidence for the state that Smith intended to kill Turner. On the stand, Smith denied intending to kill Turner, and his trial testimony, if uncontradicted by the illegal confession, might have convinced the jury that Smith intended only to harm Turner. *Accord Owen v. Alabama,* 849 F.2d 536, 540

(11th Cir.1988) (illegally admitted confession not harmless error in Alabama murder conviction, as defendant's intent to kill was "poignantly evident only in his confession"); *cf. Mason v. Balkcom,* 669 F.2d at 227 (claim of self-defense does not implicitly concede intent to kill, because one can "shoot to wound in self-defense").

In addition, the account given by Turner at trial could well have supported a verdict on the lesser included offense of voluntary manslaughter rather than malice murder. Under Georgia law, "a person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." O.C.G.A. § 16–5–2(a). Smith testified that he saw Turner grabbing a hammer, or at least holding a hammer, after Smith touched Turner on the shoulder. Smith could well have believed that Turner intended to hit him with the hammer. Even though Turner's back was turned to Smith at the time, Turner's apparent (to Smith) intent to use the hammer might have aroused "sudden passion in the person killing so that, rather than defending himself, he willfully kills the attacker, albeit without malice aforethought, when it was not necessary for him to do so in order to protect himself." *Syms v. State,* 175 Ga.App. 179, 332 S.E.2d 689, 690 (1985). "The fear of some danger can be sufficient provocation to excite the passion necessary for voluntary manslaughter." *Id.*

This case is similar to *Syms,* in which the victim pointed a gun at the defendant, thereby exciting a sudden passion in the defendant, but the defendant shot the victim when the victim glanced away, suggesting that the defendant was not justi-

---

12. In *Christopher,* we noted that we have also ruled the unlawful admission of a confession to be harmless when there was *direct* physical evidence of guilt. 824 F.2d at 846 n. 24; *see, e.g., Harryman v. Estelle,* 616 F.2d 870, 876–78 (5th Cir.) (en banc) (unlawfully admitted confession that condom found on defendant's person contained heroin harmless in light of laboratory tests identifying substance), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). Of course, this case is not like *Harryman,* for "'intent,' by its very nature, cannot be proven by direct evidence, unless the defendant expressly states his intent." *Brooks v. Kemp,* 762 F.2d at 1423 (Kravitch, J., concurring in part and dissenting in part).

fied in his use of force.[13] A case even closer to this is *White v. State*, 129 Ga.App. 353, 199 S.E.2d 624 (1973). In *White*, the victim quarreled with and threatened the defendant and "reached toward the back seat [of his car] for some unknown article, but was still sitting in his vehicle some yards away when the defendant, standing behind his son, suddenly caught up a shotgun and fired point blank at the deceased." *Id.* 199 S.E.2d at 625. In both *Syms* and *White*, the Georgia Court of Appeals held that the trial court was correct to instruct the jury on the lesser included offense of voluntary manslaughter in addition to the crime of murder and found that the evidence supported a verdict of guilty for manslaughter.[14]

We therefore conclude that the admission of Smith's confession was not harmless as to his conviction for malice murder. We likewise hold that Smith is entitled to relief from his conviction for armed robbery. Smith's confession provided the prosecution with damning evidence that Smith attacked Turner to obtain money for a new car. Smith's trial testimony tended to establish, however, that he did not form the intent to take money from Turner's wallet and cash register until the attack on Turner was completed. If the jury believed Smith's testimony, they could not have convicted him of armed robbery.

*Woods v. Linahan*, 648 F.2d 973 (5th Cir. Unit B June 1981), is instructive in this regard. In that case, Dessie Woods and Cheryl Todd were hitchhiking from Reidsville, Georgia to Atlanta when they accepted a ride from Ronnie Horne. Woods shot Horne while trying to fend off a sexual assault. After killing Horne, Woods reached into Horne's pocket and removed his wallet, containing $120, to finance the trip back to Atlanta. Woods was convicted of voluntary manslaughter and armed rob-

bery. This court sustained Woods' conviction for manslaughter but held that the evidence was insufficient to support her conviction for armed robbery. We noted that under Georgia law, "a person commits armed robbery when, (1) with intent to commit theft, (2) he takes property of another from the person or the immediate presence of another, (3) by use of an offensive weapon." *Id.* at 978. We concluded that the record was devoid of evidence showing that the defendant "used the weapon or shot the victim *in order to rob him of his money.*" *Id.* (emphasis added).

To obtain a conviction for armed robbery in Georgia, the state must prove that the defendant used an offensive weapon in order to rob the victim of his money. A rational jury could have concluded, from circumstantial evidence including the state of Turner's store after the crime, that Smith attacked Turner "in order to rob him," but in light of Smith's testimony suggesting that the theft was an afterthought, we do not find the evidence of Smith's guilt overwhelming so as to render the admission of the confession harmless.

## IV.

■ The district court concluded that the introduction of Smith's confession was not harmless as to the sentence of death, noting that Smith's trial testimony was "substantially more sympathetic" than Smith's confession. The state does not dispute that the district court's conclusion is correct under the familiar "harmless error" analysis of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Rather, the state contends that we should apply the more stringent "reasonable probability of a different result" test employed for claims of ineffective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80

---

13. Under Georgia law, a person is justified in using force against another only when he reasonably believes that such force is necessary to defend against the other's *imminent* use of unlawful force. *See* O.C.G.A. § 16–3–21. Under the facts of *Syms*, the defendant might not have been justified in believing that the victim's use of unlawful force was imminent.

14. The trial court did not instruct Smith's jury on voluntary manslaughter. Smith alleged in his petition for habeas corpus that this omission deprived him of due process, and that defense counsel was ineffective for failing to request such an instruction. *See Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The district court did not address this claim.

L.Ed.2d 674 (1984), or that we should not engage in harmless error analysis at all if we conclude that the evidence was sufficient to support the jury's finding of an aggravating circumstance.

The state's argument is without merit. Last Term, the Supreme Court confirmed that the *Chapman* standard governs harmless error as to a sentence of death. The Court pointedly disavowed any implication that we should apply a "sufficiency of the evidence" standard instead: "The question ... is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Satterwhite v. Texas*, —— U.S. ——, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828). We agree with the district court that the considerable difference between the tenor of Smith's confession and that of his trial testimony makes it impossible to conclude beyond a reasonable doubt that the improperly admitted confession did not influence the sentencing jury.

Accordingly, the order of the district court is AFFIRMED to the extent that it granted the writ of habeas corpus as to Smith's sentence of death and REVERSED insofar as it denied the writ as to Smith's convictions. The case is REMANDED to the district court with instructions to grant the writ of habeas corpus unless the state elects to afford Smith a new trial within a reasonable period, to be determined by the district court.