JOHNSON, Circuit Judge,
dissenting:
I dissent. I disagree with the majority’s conclusion that Purvis was not in custody for Miranda purposes at the time Dr. Klass questioned him. I also believe the majority errs in'not fully confronting one of the major issues in this case, i.e., whether the corroborative details Dr. Klass relayed at trial were obtained before or after the point in time at which the state court ruled Purvis to be in custody for Miranda purposes.
Though I, of course, agree with the majority’s statement that the state trial court’s factual findings must be afforded a presumption of correctness under section 2254(d), I believe the majority errs in assuming that the issue of custody is an issue of fact. Under the case law of this Circuit, the issue of Miranda custody is a mixed question of law and fact; whereas the trial court’s factual findings are afforded deference, the application of the law to those facts must be reviewed de novo. United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir.1989) (per curiam).[1]
The starting point of my disagreement with the majority involves the question of what is an issue of fact and what is an issue of law in this case. The state court’s finding that the majority believes requires the deference of the presumption of correctness under section 2254(d) is, in the majority’s own words, that “Purvis voluntarily went to the police station and was never placed under arrest or restrained in any way during his initial interview with Dr. Klass.” The majority presumably draws this statement from the state court’s order denying Purvis’s motion to suppress which reads: “Up until that point [i.e., the point at which Klass left the room and conferred with police] this Court finds that the defendant was at the police station voluntarily, that there were no restraints placed upon him and that he was not in custody for the purposes of invoking Miranda warnings.” There is no doubt that the ultimate conclusions of voluntariness and custody in the state court’s order are conclusions of law. See, e.g., Agee v. White, 809 F.2d 1487, 1494 (11th Cir.1987) (voluntariness); Torkington, 874 F.2d at 1445 (custody). The phrase “there were no restraints placed upon him,” which the state court sandwiched in between its conclusions regarding voluntariness and custody, could be interpreted either as a conclusion of law or a finding of fact. If the phrase is only further explanation of the legal conclusion that Purvis was not in custody, then the statement does not deserve the presumption of correctness. If it is a factual finding, then it must be interpreted in the narrowest sense. Under this Court’s precedent, the factual determinations that are given the presumption of correctness under section 2254 are only *1420 “historical facts in the strictest sense.” Agee, 809 F.2d at 1494. If the state court’s sandwiched-in phrase is interpreted in the strictest sense as a historical fact, it could mean only that Purvis was not physically restrained, i.e., he was not handcuffed or placed behind bars. To assign to the phrase any broader meaning would result in a confluence of conclusions of law and issues of fact, and would thus preclude federal review completely by affording all determinations of the state trial court the presumption of correctness.
Other than this “sandwiched-in” phrase, the state trial court made no factual findings regarding the restraint imposed upon Purvis between the time he arrived at the police station and the time he initially confessed to Dr. Klass even though extensive testimony was presented on this issue at the suppression hearing. The majority implies that the state court made a factual finding that Purvis left the interrogation room to get water, never requested a lawyer, never said he wanted to go home, and never asked to terminate the interview. But the state court made no such findings, just as the state court made no findings regarding Purvis’s repeated requests to call his mother.
At the state suppression hearing, the evidence was unrefuted that the police inhibited Purvis from contacting his mother while he was at the police station. Detective Ciani stated that Purvis may have asked to be allowed to contact his mother as many as fifteen times within the short span of time it took to elicit the confession:
Q. Good enough, okay. Now, did John ask to call his mother while you were present?
A. [Detective Ciani] Yes, he did.
Q. How many times?
A. At least four, five, six, seven times, several times.
Q. Would it be more like ten or fifteen times?
A. Could be. I didn’t keep count.
Q. Would it be fair to say, sir, that you’d been talking to him and he’d just fistop and say could I go call my mother?
A. He would stop and ask if he could call his mother.
Q. Now, on occasions when he’d asked to call his mother you’d say or somebody would say, John, we tried to, the line’s busy or something of that nature?
A. Detective Martin tried. I also tried.
Q. I said that was what you told him?
A. Yes.
Q. And he’d wait a few minutes, maybe 30 seconds and ask again; would he not?
A. Sometimes, yes, sir.
Q. Say okay, is it time now? This would be only a 30-second lapse?
A. Sometimes quicker, sometimes it took more time.
(R2:277-78).
Under the law of our Circuit, “in order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect’s position would feel a restraint on his freedom of movement fairly characterized as that ‘degree associated with a formal arrest’ to such extent that he would not feel free to leave.” United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir.1987) (emphasis added) (quoting Minnesota v. Murphy, 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984)). Purvis's repeated requests to call his mother are of great significance when one considers the “totality of the circumstances.” Id. at 1360. The detectives had contacted Purvis at the drugstore as he was getting out of his car. They asked him to come to the station. But rather than having Purvis follow the detectives in his own car, they directed him to lock up his car and accompany them in the police car. Once at the station, Purvis would not have had any way to leave and return home or to the drugstore where his car was parked without his mother’s assistance. His repeated efforts to obtain permission to telephone her can be equated with attempts to leave the police station. When such attempts are constantly thwarted, the reasonable person would come to believe that he or she was *1421 not free to leave, but was instead in custody.
In order for the “presumption of correctness” under section 2254 to apply, the state court must actually reach and decide the issue of fact. Townsend v. Sain, 372 U.S. 293, 313-14, 83 S.Ct. 745, 757-58, 9 L.Ed.2d 770 (1963); Smith v. Zant, 855 F.2d 712, 716 n. 5 (11th Cir.1988), aff'd, 887 F.2d 1407 (11th Cir.1989) (en banc). The state court in the case at bar simply made no findings as to the thwarting of Purvis’s attempts to contact his mother or whether the police even made a good faith effort to locate her after telling Purvis they would call. In a situation in which “the state court has decided the merits of the claim but has made no express findings, ... the Federal District Court [is] compelled to hold a hearing.” Townsend, 372 U.S. at 314, 83 S.Ct. at 757. The question of law as to whether Purvis was in custody at the time he confessed to Dr. Klass cannot be resolved, in my opinion, without factual findings regarding the thwarting of Pur-vis’s efforts to contact his mother. I would therefore remand the case on this issue with instructions to hold an evidentiary hearing to determine the degree of restraint imposed upon Purvis from the time he arrived at the station to the moment of his initial confession.
My second point of disagreement with the majority opinion involves the issue of whether the state court erred in allowing Dr. Klass to testify as to certain corroborative details. The state trial court ruled in the pretrial suppression order that Miranda custody occurred at the moment that Dr. Klass came out of the interrogation room and conferred with the detectives, informing them that Purvis had implicated himself. Under the state court order, Dr. Klass was free to testify regarding anything which Purvis told him prior to that point.[2] It is therefore important whether Purvis related the details of the killing before or after Dr. Klass went out to confer with the detectives.
The majority correctly recognizes in part II of its opinion that the sequence of events is an issue in this case. Having acknowledged the issue, however, the majority then neglects to confront it. The majority states that Dr. Klass’s testimony did not violate the suppression order as it was written. In so stating, the majority passes over the point and focuses instead upon a non-issue which no one disputes. The real issue is whether the suppression order itself is “fairly supported by the record.” See Parker v. Dugger, — U.S. -, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991). The majority brushes up against this issue in its race toward the non-issue by its statement that “[t]he state trial court was in the unique position to decide what information Dr. Klass received from Purvis while the two were alone after listening to all of the witnesses and the evidence presented.” If there were evidence in the record that the corroborative details came out while the two were alone, this statement would make sense. However, the only evidence of details emerging prior to the critical point in time concerns the color of the undergarments.
During the direct examination of Dr. Klass at the suppression hearing, there was a great deal of confusion as to the sequence of events during the confession. The direct examiner clearly tried to get Dr. Klass to focus on the question of when Purvis gave the details, but was unsuccessful. Dr. Klass testified as follows:
Q. Before the police became involved in any of the interrogation of the defendant, what information did he provide to you?
A. That he had cared about her, that she was not very responsive, that he stabbed her in the heart, the undergarment colors, that he had used a lamp cord from his home, that the knife was from his home; that he had gone to tell *1422 his mother, and she said it was horrible, but not to tell anyone.[3]
Q. From a sequential point of view, this information was provided to you pri- or to the police becoming involved in the interrogation; is that correct?
A. Well, they were involved in that at times they were in the room.
Q. In terms of the police being involved, specifically in the interrogation or asking questions, what I am driving at is: What information did he provide for you before the police began asking any questions?
A. Well, the reason I can’t answer this specifically is that at times they would ask a question.
Q. Can you give us as much information as you can prior to the time the police became involved in the interrogation?
A. Primarily, the relationship that he had with her was apparently more intense and more of an interest on his part than I think he portrayed the woman as showing, and that he, I think, felt rebuffed at the door, that he went to go in or wanted to talk to her. He said that he wanted to talk, but she either didn’t have time — but I felt that he was describing some kind of a rebuff at the door, and he said that he directly went in and stabbed her.
He related, as I mentioned, about the undergarment colors, what he had told his mother, and there may have been some other points. The two contradictory ones I recall were one was related to the knife. I believe that was after a policeman had asked, “Where did you get the knife from?”
There was also an incident about her being strangled, and a policeman had asked, “What did you strangle her with?” which I felt annoyed at, because I felt that implied that it was something other than one’s hand, and I felt that it was a little bit leading.
Q. After, and again taking this in chronology now, after the defendant had provided certain of the information to you that he had stabbed her, what her undergarments looked like, that he had liked her and that she had rebuffed him, and various other things that you indicated were basically prior to the police interrogation, did you go out and tell the police what that information was? Did you advise them at this point that the defendant had made statements and this is basically what he said?
A. Well, during some of the questioning the police were there, but at one point I thought it would be helpful to know more about the specifics, to know was the person giving me information that only this person could know, was it accurate or not, and that was when the policeman showed me some photographs and indicated that the woman was partially disrobed, that there was an accurate description of the bra and panty colors.
Q. Did you relate to the defendant that the police had gotten an accurate description of the bra and panty colors?
A. I recall commenting that statistically I felt I thought that would be important that someone could identify those colors, because in my own mind if I thought of five common bra or panty colors being like black, white, beige, so forth, the chances of his getting both of those questions would be five times five or twenty-five, so one in twenty-five was a very unusual prediction.
At the same time I mentioned to them that there were contradictions, that he at several times described the knife as coming from his home and a lamp cord being involved when the police told me that there was, I believe, a telephone cord *1423 that was involved. So there were contradictions, and other times what seemed to be corroborating information.[4]
(R1:79-82).
The cross-examiner, however, was more successful in eliciting information regarding the sequence. Dr. Klass testified on cross-examination:
Q. How long would you say John had been interviewed by you and/or the detective before he finally got around to this saying, “I stabbed her.”
A. It would be a guess; at 30 minutes.
Q. After that statement was made, did you go into specifics at that time?
A. There were some questions about specifics, yes.
Q. By whom?
A. By myself and the policemen.
Q. What specifics did you go into?
A. I tried to go into the specifics of his feelings at the time. His awareness of those things I thought would be more in his awareness such as the color of her underclothing and his response to what he did.
Q. Did anyone else at that time go into the other specifics?
A. Yes.
Q. Right then and there?
A. Yes.
Q. Who was that?
A. The policemen.
Q. Martin and Rice?
A. Yes.
Q. And what specifics did they go into at that time?
A. “Where did you get the knife? What did you use to strangle her with? Where did you get it from?” and questions about the child: “Did you do anything afterwards? Did you do anything with the child?” Something about a milk bottle, baby bottle.
(R1:94-95).
It is clear from this testimony that the detectives were present in the room when most of the details initially came out. Consequently, it would seem that these details were relayed after Dr. Klass had left the room and returned with the detectives, i.e., after the point in time at which Purvis was in custody for Miranda purposes according to the state court’s ruling.
When Dr. Klass was later recalled to testify at the suppression hearing,[5] moreover, he related the following:
Q. The specifics that you were trying to find out was anything that might identify him as the perpetrator or not identify him as the perpetrator?
A. That’s correct.
Q. And one of the things that you elicited was the question what color were her undergarments and he said she had on a beige bra and white panties?
A. Yes.
Q. It was at that time that you went out, told the police that John had said he killed Susan?
A. I don’t recall the exact time, but it was not long after that point, yes.
*1424 Q. And then you looked at the photographs?
A. I believe that was the sequence, yes.
(R3:414).
Detective Rice then testified as to his recollection of the sequence of events:
Q. I just want to ask you this, sir. Taking you back to when John Purvis was being interrogated by Dr. Klass in the interrogation room—
A. Yes.
Q. You were outside?
A. That’s correct.
Q. Dr. Klass came out and said John has said he killed the girl?
A. Yes.
Q. And told you that John had indicated that Susan Hamwi was wearing a beige bra and white panties?
A. I believe that’s it.
Q. And that’s when you looked at the photographs?
A. Yes.
Q. And then as I understand it, you and Detective Ciani and Dr. Klass went back into the interrogation room or interview room, whichever you call it, and then proceeded to question John about specifics?
A. Yes, sir.
(R3:423-24).
The supplemental testimony of Dr. Klass and the testimony of Detective Rice would seem to indicate that Dr. Klass learned only the color of the victim’s undergarments prior to emerging from the room.
The state trial court, however, found in the order granting in part and denying in part the motion to suppress, that
During the interview the defendant provided various background information concerning himself and his relationship with the victim. The defendant admitted that he loved the victim but had been rebuffed by her. He admitted going to her house and killing her and provided to Dr. Klass corroborative details, which included among other things, that he had stabbed her with a knife, strangled her with a cord, and that he had gone home to tell his mother and she had advised him not to tell anyone. He described the color of her undergarments.
But based on the testimony quoted above, the only detail one could legitimately assume Purvis gave prior to the point in time at which the state court found Miranda custody occurred was the color of the undergarments. The state court’s ruling that the entire series of details was conveyed to Dr. Klass prior to the critical point in time is therefore not “fairly supported by the record” as required by section 2254(d)(8). Consequently, the state court ruling is not due the deference of the presumption of correctness. Parker, 111 S.Ct. at 739.
But more importantly, at trial Dr. Klass clarified his prior equivocation as to the sequence of events. On cross-examination, he testified as follows:
Q. All right. Now, sir, do you recall going outside and talking to the police officer?
A. Yes.
Q. You talked to Rice?
A. I can’t recall which ones.
Q. Martin and Rice were there; were they not?
A. Yes.
Q. They were interested in what was going on I assume?
A. Yes.
Q. But you did talk to either Rice or Martin?
A. Yes.
Q. You told them what John had said to some extent. You said he’d implicated himself?
A. Yes, that would be my phrase.
Q. Now, at that time you were trying to find out, were you not, something that might corroborate what he might say to you. You asked to see the photographs?
A. I don’t recall if I knew there were photographs at that time, but after a brief discussion that became evident that there were and I thought there may be then some corroborating evidence whether she was actually stabbed, was she hit with a blunt object or whatever, and *1425 they’d indicated that she was stabbed and that they had photographs and I felt that the line of questioning that they were talking about when they were giving me information about it or questions that they were going to ask, whatever, did not seem to be something that if you were the perpetrator would be clearly in his mind.
I did not feel that someone in that state in committing a homicide would have a recall of what may be incidental to their interests but rather more central and when he indicated that there was perhaps some sexual contact that it would be undergarments, for instance, or aspects about her body that would be more in his awareness.
Q. That was all mentioned to you at the time that you went out and looked at the photographs; is that not true?
A. I believe that was the time, yes. I do know that was the first time I learned more about the specifics, yes.
Q. You didn’t know about the sexual contact until after you went out and looked at the photographs which was after the time you had the conversation with Rice and Martin?
A. I believe that’s correct, yes.
Q. They showed you photographs?
A. Yes.
Q. I think most of the photographs are in evidence which showed Mrs. Ham-wi laying on the floor.
A. Yes.
Q. Partially disrobed?
A. Yes.
Q. And at that point you figured there must have been at least some sexual contact or possibly some?
A. I didn’t think there would be a great deal of sexual contact from the state of her being disrobed, but there was some sexual interest, certainly, yes.
Q. That’s what I meant as opposed to contact. Some sexual interest or connotation.
A. Yes.
Q. And that was the first time you knew about that; is that not true?
A. I believe so. I’m not certain, but I believe so.
Q. It’s at that point then you’re looking at the photographs and decide to see what can be corroborated; is that correct?
A. Yes.
Q. You go back in and you talk to John?
A. Yes.
Q. And that’s when you asked him what color her bra and panties were; is that not true?
A. Yes.
Q. And he said beige or white?
A. Immediately he answered her bra was beige, her panties were white.
Q. When you went in and asked John, when you looked at the photographs that was after you told Rice and Martin that he said he killed her; isn’t that true?
A. Yes.
Q. After that you walked back in, you proceeded to look at the photographs, you observed the color of the bra and the panties; is that not true?
A. Yes.
Q. And is it not true then that after you did that, sir, you walked back in the room and said to John what color was her bra and he said beige, what color were her panties and he said white? Isn’t that the sequence of events?
A. I believe that’s correct, yes.
(R7:1258-63) (emphasis added).
It is clear from this testimony that Dr. Klass did not even learn the color of the undergarments until after the critical point of custody had passed. By the time that Dr. Klass gave this testimony at trial clarifying the sequence of events, the jury had already heard many of the corroborative details. In spite of this testimony, the state trial court refused to change its suppression order and denied Purvis’s motion for a mistrial.
In my view, the state trial court probably erred by admitting any of Purvis’s confes *1426 sion to Dr. Klass. Further factual findings are necessary, however, before it can be determined if Miranda custody occurred prior to the interview with Dr. Klass as a result of the police efforts to thwart Pur-vis’s attempts to call his mother. Even if Miranda custody occurred only when Dr. Klass emerged from the interrogation room and informed police that Purvis was implicating himself, as the state court ruled, admission of the corroborative details given after that moment violated Miranda. On this record, the only detail one could say may have been relayed prior to Dr. Klass’s emerging from the room was the color of the undergarments. Dr. Klass, however, changed his mind at trial about when he learned about this detail. There can be no doubt that admission of the entire series of details violated Miranda. I would, consequently, grant the writ of ha-beas corpus.

. The state trial court’s factual findings in its order denying in part and granting in part the motion to suppress are minimal. They are: (1) the detectives contacted Purvis at the drug store and asked him to come to the station for questioning; (2) he agreed to talk to Dr. Klass who had identified himself as a psychiatrist assisting the police; (3) during the interview with Dr. Klass, Purvis confessed to the killing and related certain corroborative details; (4) Dr. Klass left Purvis in order to inform the detectives of the confession; (5) Purvis was, at that point in time, no longer free to leave by the state’s own concession; (6) questioning continued without proper Miranda warnings being given; and (7) Purvis had sufficient intellectual capacity to understand and appreciate his circumstances.

. According to the portion of the order not quoted by the majority, these details included the following: "that he [Purvis] had stabbed her with a knife, strangled her with a cord, and that he had gone home to tell his mother and she had advised him not to tell anyone. ... [and] the color of her undergarments."

. This answer, as well as others in the direct examination, would support the state court's ruling as to the sequence of events if taken out of context. The wording of this particular answer is so close to that in the state court’s order denying suppression, quoted infra, that this may be the actual source of the state court’s error. In every instance in Dr. Klass’s direct in which he appears to say that the details came out prior to his informing the detectives that Purvis had implicated himself, however, he later contradicts or equivocates upon that assertion when the examiner tries to get him to clarify the sequence.

. In his interview with Dr. Klass and the detectives, Purvis supplied detailed answers to questions regarding a large number of the specifics of the murders. But he got almost all of the details wrong. For example, Purvis stated that Ms. Hamwi wore pink clothing or perhaps a light-colored blouse. (R1:125). In reality, she wore a dark brown pullover. (R1:147, 149). Purvis said he strangled Ms. Hamwi with a cord he took from his bedroom at home. (R1:126). Ms. Hamwi was actually strangled with the telephone cord from her kitchen. (Rl:146). Purvis told the detectives he stabbed Ms. Hamwi with a knife he brought from his house. (R1:123). In truth, she was stabbed with a knife taken from her own kitchen. (R1:145-46). Purvis stated that he stabbed Ms. Hamwi three times. (R1:124). There were only two stab wounds on the body. (R1:154). Purvis claimed to have strangled and smothered the infant. (R1:127-28). In fact, the baby was not harmed by the perpetrator, but died from dehydration. (R1:151). Finally, when the detectives suggested to Purvis that he had stolen jewelry from Ms. Hamwi, Purvis stated that he stole a watch and took it home and hid it in his drawer. (R1:136-37). Though the detectives had originally thought a ring was missing, it was later found in the house; there was no jewelry missing at all. (R1:151-53).

. The suppression hearing was held in six different segments over a period of over nine months. Dr. Klass first testified on May 22, 1984. He was recalled on March 4, 1985.